**Willis METHENY, et al., Plaintiffs,**

v.

**Garfield HAMMONDS, Jr., Defendant.**

No. 5:96–CV–278–1(CWH).

United States District Court,
M.D. Georgia,
Macon Division.

March 24, 1999.

Robert Earl Toone, Jr., Atlanta, GA, for plaintiffs.

Neal B. Childers, Mr., Atlanta, GA, for defendant.

**Proceedings Under 42 U.S.C. § 1983 [1]
Before the Magistrate Judge.**

HICKS, United States Magistrate Judge.

### *ORDER* [2]

Presently pending before the court are two motions for summary judgment filed on behalf of the plaintiffs and the defendant in this case. Tab Numbers 36 and 40. The facts in this case are essentially undisputed and are recounted in some detail hereinafter.[3]

---

1. As relief, the plaintiffs "are not seeking damages in this action, nor are plaintiffs asking for immediate release. Plaintiffs are asking only for consideration for parole, under the procedures utilized by the Board of Pardons and Paroles prior to January 1, 1995." Plaintiff's Original Complaint, at 2.

Attacks on procedures used in parole decisions are cognizable under § 1983. However, attacks on the results of such decisions are not and must instead be brought pursuant to a habeas corpus action. *Parisie v. Morris,* 873 F.Supp. 1560, 1565–66 (N.D.Ga.1995). *See Gwin v. Snow,* 870 F.2d 616 (11th Cir.1989).

2. The parties have consented for the United States Magistrate Judge to conduct any and all proceedings herein including the ordering of the entry of judgment. Any appeal from this judgment permitted by law may be taken directly to the Court of Appeals of the Eleventh Circuit in the same manner as an appeal from any other judgment of a district court. 28 U.S.C. § 636(c)(3).

3. A more thorough factual recitation of the background of this case may be found in the plaintiff's statement of material facts. Tab # 42.

## 1. Background

This lawsuit was initiated pursuant to 42 U.S.C. § 1983 by four Georgia state prisoners, WILLIS METHENY, EDWARD LANG, PAUL IVEY, and CHARLIE PRITCHETT.[4] All four of the plaintiffs were convicted as recidivists under former O.C.G.A. § 17–10–7(b), now codified as § 17–10–7(c) (hereinafter referred to as § 17–10–7(c)).[5]

O.C.G.A. § 17–10–7(c) traces its history back to 1953. *See Kryder v. State*, 212 Ga. 272, 91 S.E.2d 612, 614 (1956). In its present form, it provides that:

> [e]xcept as otherwise provided in subsection (b) of this Code section, any person who, after having been convicted under the laws of this state for three felonies or having been convicted under the laws of any other state or of the United States of three crimes which if committed in this state would be felonies, commits a felony within this state other than a capital felony must, upon conviction for such fourth offense or for subsequent offenses, serve the maximum time provided in the sentence of the judge based upon such conviction and shall not be eligible for parole until the maximum sentence has been served.

The Georgia Board of Pardons and Paroles never adhered to the terms of this statute. Instead, based upon opinions issued by two attorneys general, the Board adopted the position, reflected in its rules, policies, and practices, that the legislature lacked the authority to restrict its constitutionally granted parole authority by enactment of general laws such as § 17–10–7(c).[6] See Op.Att.Gen.1954–56, 519–21; Op. 69–431.[7]

Over the years, the Georgia courts took the position that no prisoner had standing to question the constitutionality of § 17–10–7(c) until he had been denied parole

---

4. The plaintiffs styled their complaint in the form of a class action. However, no class action has ever been certified by the court.

5. Plaintiff METHENY was sentenced in November 1991 to sixty years. METHENY was at a transitional center, preparing to be paroled, when he was informed by the Board that he was no longer eligible for parole. Plaintiff LANG was arrested in October 1993 and sentenced in June 1995 to 30 years. LANG was informed by the Board that he would not be eligible for parole. Plaintiff IVEY was arrested in November 1994 and sentenced in February 1995 to 15 years. IVEY was informed by the Board that he would not be eligible for parole. Plaintiff PRITCHETT was arrested on February 11, 1994 and sentenced in November 1994 to 25 years. PRITCHETT received a tentative parole date prior to being informed by the Board that he would not be eligible for parole. *See Weaver v. Graham*, 450 U.S. 24, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981) (the focus in determining whether a new law violates the Ex Post Facto Clause is the time the offense was committed); *Kellogg v. Shoemaker*, 46 F.3d 503, 508 (6th Cir.1995).

6. Subparagraph (a) of Article IV, Section II, Paragraph II of the 1983 Georgia Constitution provides "Except as otherwise provided in this Paragraph, the State Board of Pardons and Paroles shall be vested with the power of executive clemency, including the powers to grant reprieves, pardons, and paroles; to commute penalties; to remove disabilities imposed by law; and to remit any part of a sentence for any offense against the state after conviction."

7. Attorney General Eugene Cook issued his opinion shortly after the statute's enactment. Attorney General Arthur Bolton issued his opinion in 1969 reaffirming Cook's opinion that the statute was unconstitutional. Bolton noted in his opinion that:

> I am mindful that a declaration of a statute's unconstitutionality is a judicial prerogative and that the courts restrict such decisions to cases in which the infirmity is inescapable. It is the general policy of this office to refrain from issuing opinions which conclude that a statute is unconstitutional. This policy is uniformly applied in all instances in which the constitutional issue may be readily litigated. I have not adhered to the general policy because the question presented cannot be readily litigated. As the granting of relief by your agency [the Parole Board] is a matter of grace, the opportunity for the question to be presented to a court is severely circumscribed. Even so, I could render this opinion in good conscience only after satisfying myself that the infirmity is palpable and that the possibility of differences of interpretation is remote.

pursuant to its terms. *See Kryder v. State*, 91 S.E.2d at 614–15. *See also Green v. State*, 244 Ga. 755, 262 S.E.2d 68 (1979). Apparently since no prisoner was ever denied parole pursuant to the terms of the statute, it was never effectively challenged in the Georgia courts and no Georgia court specifically ruled on its constitutionality prior to the enactment of the January 1, 1995 constitutional amendment. However, the Georgia courts indicated that substantive legislative limits on the Board's discretion to grant parole would be unconstitutional.[8]

On February 28, 1994, the Supreme Court of Georgia decided *Freeman v. State*, 264 Ga. 27, 440 S.E.2d 181 (1994). This was a death penalty case where various issues were certified to the court for interim review. One of those issues was a separation of powers challenge to the constitutionality of O.C.G.A. § 17–10–16, which provided for a sentence of life without possibility of parole in certain circumstances. § 17–10–16 was a general law, as was § 17–10–7(c). Like § 17–10–7(c), § 17–10–16 sought to restrict the Board's ability to grant parole to a certain class of convicted felons.

In *Freeman*, the Supreme Court of Georgia upheld the constitutionality of § 17–10–16 finding that "[t]he passage by the legislature of a statute providing for a sentence of life without parole, like the passage of legislation establishing the death penalty, does not impinge on the authority of the Board but, rather, renders the defendant ineligible for parole in the first instance." 440 S.E.2d at 184. *See also Rower v. State*, 264 Ga. 323, 443 S.E.2d 839, 841 (1994).[9]

A constitutional amendment providing that previously enacted general laws restricting the Board's authority were ratified, went into effect on January 1, 1995. This amendment provides that "[a]ny general law previously enacted by the General Assembly providing for life without parole or mandatory service of sentences without suspension, probation, or parole is hereby ratified and approved but such provisions shall be subject to amendment or repeal by general law." Ga. Const. Art. IV, § II, ¶ II(b)(4).

On February 14, 1995, Attorney General Michael Bowers issued an official opinion concerning the constitutionality of the statute at issue herein to then Chairman of the Board of Pardons and Paroles, J. Wayne Garner.[10] In response, the Board re-

---

**8.** *See Charron v. State Bd. of Pardons and Paroles*, 253 Ga. 274, 319 S.E.2d 453, 455 (1984); *Stephens v. State*, 207 Ga.App. 645, 428 S.E.2d 661, 663 (1993). *See also Sultenfuss v. Snow*, 35 F.3d 1494, 1506 (11th Cir. 1994) (en banc) (Carnes, J., dissenting).

**9.** Later, in *Moore v. Ray*, 269 Ga. 457, 499 S.E.2d 636, 637 (1998), the Supreme Court of Georgia held that § 17–10–7(c) did not unconstitutionally impinge on the authority of the Parole Board.

**10.** In his opinion (Ga.Op.Atty.Gen. No. 95–4, 1995 WL 124594), Bowers noted the court's decision in *Freeman*. Bowers stated that:

[t]he decision in Freeman, however, is no longer controlling for purposes of determining the Board's authority to exercise parole power because of the amendment to the Georgia Constitution Art. IV, Sec. II, Par. II . . . approved in the November 1994 general election, and the passage of the Sentence Reform Act of 1994 . . . which amended several sections of the Georgia Code. Before the 1994 constitutional amendment, there existed the potential for conflict between the legislative prerogative of the General Assembly to establish crimes and prescribe punishment and the Board's constitutionally-derived power to grant clemency. With passage of the constitutional amendment in November 1994, the General Assembly now has clear authority to enact 'general law approved by two-thirds of the members' which limits the Board's power to grant clemency, and that limitation has a constitutional basis. The two additional areas where the Board's authority now has been constitutionally limited are (1) minimum mandatory sentences for certain specified offenses and (2) life without parole for certain specified offenses. The potential for conflict which was presented by the Freeman decision has now been recognized and addressed by the electorate.... [N]ot only did the constitutional amendment breathe vitality into the criminal statutes which were passed by the 1994 General Assembly contingent upon

1384

versed its practice of the previous forty years and began considering prisoners sentenced under § 17–10–7(c) ineligible for parole.[11]

## 2. Relevant Law and Disposition of the Case

In *Lynce v. Mathis*, 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997), the Supreme Court reiterated that "[t]he presumption against the retroactive application of new laws is an essential thread in the mantle of protection that the law affords the individual citizen. That presumption is 'deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.' This doctrine finds expression in several provisions of our Constitution." 117 S.Ct. at 895 (internal citations omitted).

"The specific prohibition on ex post facto laws is only one aspect of the broader constitutional protection against arbitrary changes in the law. In both the civil and criminal context, the Constitution places limits on the sovereign's ability to use its law-making power to modify bargains it has made with its subjects. The basic principle is one that protects not only the rich and powerful but also the indigent defendant engaged in negotiations that may lead to an acknowledgment of guilt and a suitable punishment." *Id.*

The Court went on to state that "[t]o fall within the ex post facto prohibition, a law must be retrospective—that is 'it must apply to events occurring before its enactment'—and it 'must disadvantage the offender affected by it' by altering the definition of criminal conduct or increasing the punishment for the crime." *Id.*, at 896. The Court further noted that "retroactive alteration of parole or early release provisions, like the retroactive application of provisions that govern initial sentencing, implicates the Ex Post Facto Clause because such credits are 'one determinant of petitioner's prison term and the petitioner's effective sentence is altered once this determinant is changed.'" *Id.*, at 898.[12]

In *Jones v. Garner*, 164 F.3d 589 (11th Cir.1999), the Eleventh Circuit reiterated its position, previously set forth in *Akins v. Snow*, 922 F.2d 1558 (11th Cir.1991), that retroactive application of certain changes in the rules governing parole consideration violates the Ex Post Facto Clause of the Constitution.

The Eleventh Circuit noted that in order for a change to violate the Ex Post Facto Clause, the change must be retrospective, that is, it must apply to events occurring prior to its enactment, and the change must disadvantage the offender affected by it. 164 F.3d at 591 n. 3.[13]

In the case at bar, the Board's change in parole policy was applied retroactively.[14]

ratification of the proposed constitutional changes, it expressly ratified and approved previously enacted statutes dealing with life without parole and mandatory service of sentences, importing constitutional authority to them.... In summary, it is my official opinion that as of January 1, 1995, there have been placed additional constitutional limitations on the Board's power to parole which now are the clear prerogative of the General Assembly to proscribe.

11. In March, April, and August of 1995, the plaintiffs received letters informing them that due to information provided by the Attorney General to the Parole Board in February 1995, they were no longer considered eligible for parole.

12. The Court also noted that the Due Process Clause protects the interests in fair notice and

repose that may be compromised by retroactive legislation. 117 S.Ct. at 895 n. 12.

13. The Eleventh Circuit further noted that additional factors must be considered such as whether the rule change applies only to a class of prisoners for whom the likelihood of parole is quite remote and whether the rule change was carefully tailored so as to support a finding that the change was intended only to save time and money, not to increase the quantum of punishment. 164 F.3d at 593–96.

14. It is important to remain focused in this case on the Board's policy and practice of the previous forty years (later incorporated in its rules) and the recent reversal of its policy and practice concerning parole consideration for recidivists sentenced under § 17–10–7(c). It is also important to note that the Board's

The Board's change in policy also without question disadvantaged the prisoners affected by it.[15] Indeed, it would difficult to imagine a more dramatic impact on any prisoner as a result of a change in parole policy than has occurred in this case. The change has been retroactively applied to prisoners for whom parole was previously not a remote possibility. Indeed, all prisoners similarly situated to the plaintiffs were previously considered for parole and many were paroled. The number of prisoners impacted is significant. Finally, the policy change cannot be said to have been intended only to save time and money. The change was intended to increase the quantum of punishment.

In sum, the undersigned finds that retroactive application of this change in parole consideration violates the Ex Post Facto Clause of the United States Constitution.[16] Accordingly, in light of the above, the plaintiffs' motion for summary judgment is **GRANTED.** The defendant's motion for summary judgment is DENIED.[17] The Parole Board is hereby enjoined from retroactively applying to the plaintiffs the policy change implemented in February of 1995, determined by the court to be in violation of the Ex Post Facto Clause; the Board shall immediately take steps to consider parole for the plaintiffs in accordance with the previously existing policy.

SO ORDERED.

actions have consistently been based on opinions by the Attorney General of Georgia, as would be expected since "[u]nder Georgia law the Attorney General is the official legal advisor of all agencies of state government ... and [he] has the role of interpreting all Georgia laws for state boards and departments." *See* Tab # 1, Plaintiff's Exhibit C; Ga. Const. Art. V, § III, ¶ IV; O.C.G.A. § 45–15–3.

15. This policy change has apparently not yet been incorporated into the Parole Board's rules. However, it is undisputed that the policy itself has changed and that this change is being followed. In the undersigned's view, it is of no consequence for ex post facto purposes that the rules themselves have not yet been altered to reflect this change. The impact on the prisoner is the same and to hold otherwise would elevate form over substance.

16. Having found the Ex Post Facto Clause violated, it is unnecessary to specifically address the due process and desuetude assertions raised by the plaintiffs.

17. The defendant has submitted a recent Eleventh Circuit decision in support of his position. However, the Eleventh Circuit decision he cites (contained in the correspondence section of the file) is unpublished and not binding on this court. *See* 11th Cir.R. 36–2.